FILED
CLERK
6/15/2015 2:24 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
THOMAS SIRICO,

                Petitioner,

  -against-

**OPINION AND ORDER**
**12-CV-0358 (SJF)**

NEW YORK ATTORNEY GENERAL,

                Respondent.
----------------------------------------------------------------X
FEUERSTEIN, District Judge:

Before the Court is Thomas Sirico's ("petitioner") petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The government has opposed the petition. For the following reasons, the petition for a writ is **DENIED** and this proceeding is dismissed.

**I.    Background**

    **A.    Munoz's Murder**

At approximately 8:00 p.m. on January 8, 2006, Juan Carlos "Angel" Munoz ("Munoz") became involved in a fight between petitioner and his roommate William Redlich ("Redlich").[1] Ans. ¶ 6. Munoz, who was visiting the house across the street from petitioner's, heard petitioner and Redlich shouting and told them to "shut up" and "cut it out." *Id*. Petitioner threatened Munoz, yelling that he would "kill every last one of you drug dealing MF's across the street." *Id*. Munoz responded that he and his friends were not listening to petitioner's conversation and told petitioner to mind his business. *Id*. Petitioner asked who made the comment and when Munoz identified himself, petitioner raised his hunting bow, drew it back and released a razor-tipped arrow which hit Munoz in the chest, penetrating his heart and lungs. *Id*. Munoz was pronounced

---

[1] The facts are taken from respondent's answer (DE 8) and the documents cited to therein.

dead an hour later. *Id.*

    **B.    The Proceedings**

        **1.    The Indictment**

On January 12, 2006, pursuant to indictment number 173-2006, a Suffolk County grand jury indicted petitioner on two (2) counts of second degree murder for depraved indifference (count one (1)) and intentional murder (count two (2)). *Id.* at ¶ 7.

        **2.    Pre-Trial Hearings**

On November 6 and 8, 2006, the Honorable Barbara Kahn, County Court, Suffolk County, conducted *Wade*[2] and *Molineux*[3] hearings and on November 13, 2006, a *Sandoval*[4] hearing. *Id.* at ¶ 8.

        **3.    The Trial**

A jury trial in this matter commenced November 16, 2006 and ended December 12, 2006. *Id.* at ¶ 9. According to the testimony, petitioner and Redlich had been friends for more than fifteen (15) years and resided together at 193 Monroe Street, Mastic, New York. *Id.* Petitioner and Redlich were motorcycle enthusiasts, keeping two (2) motorcycles in their living room; one (1) belonged to Redlich and the other was owned by the men's mutual friend, Dominic Zulferino ("Zulferino"). *Id.* Petitioner, who was also an avid hunter and accomplished marksman, owned several compound hunting bows and practiced target shooting several times per week in his backyard; his aim was described as "very accurate." *Id.* Petitioner was approximately 5'9" tall

---

[2] *United States v. Wade*, 388 U.S. 218 (1967).

[3] *People v. Molineux*, 61 N.E. 286 (N.Y. 1901).

[4] *People v. Sandoval*, 314 N.E.2d 413 (N.Y. 1974).

and wore a prosthetic lower leg, which attached underneath his left knee. *Id.*

At approximately 4:00 p.m. on the day of the shooting, petitioner and Redlich began to argue over the cost of the rent and the fact that Redlich's girlfriend, Jean Prisco ("Prisco"), did not contribute to the household. *Id*. at ¶ 11. The argument escalated and petitioner kicked Prisco out of the house, after which he called 911 and falsely reported that Prisco had been involved in a drug deal and gunfight with the neighbors across the street. *Id*. Petitioner declined the 911 operator's offer to send an officer to file a report, responding that he wished to remain anonymous because the neighbors were drug dealers. *Id.* When police appeared in the area approximately ten (10) minutes later, there was no activity at the stated location and when questioned, the homeowner appeared genuinely surprised; the officer observed a family watching television and engaging in normal activities. *Id.*

Following the 911 call, Redlich took the keys to his motorcycle, deflated its tires and left the residence. *Id*. at ¶ 12. Petitioner destroyed the motorcycle with an axe and called Redlich repeatedly, ordering him to return home so the men could fight. *Id*. At approximately 7:30 p.m., Redlich returned, but stayed outside at the end of the driveway where his truck was parked. *Id*. at ¶ 13. Petitioner met Redlich outside of the house and attempted to goad him into a physical altercation, but returned to the house after Redlich refused. *Id*. Minutes later, petitioner reappeared on the front porch carrying his compound bow and two (2) arrows. *Id.*

Petitioner began yelling that he wanted to shoot or kill someone and ordered Redlich or Zulferino, who had been present during the argument with Prisco, to take him for a ride to find somebody. *Id*. at ¶ 14. Redlich refused and petitioner stated that if Redlich would not drive him, he would shoot either Redlich or Zulferino, at which time Zulferino ran and hid behind his work

truck, which was parked in the road. *Id*. Standing on his front porch, petitioner notched an arrow and fully drew back the bow, aiming it at Redlich, who was hiding behind his own truck, and then, readjusting his aim, shot the side of Zulferino's work truck. *Id*. at ¶ 15. Despite Zulferino's attempts to calm petitioner, who was screaming, ranting and raving, petitioner loaded the bow with another arrow and aimed it at him. *Id*. As the fight escalated, people from the house across the street began to yell, telling the men to "shut up, cut it out" at which time petitioner approached them, telling them to mind their business and go inside. *Id*. at ¶ 16. Munoz told petitioner to mind his own business, petitioner became enraged, drew back and shot an arrow into Munoz's chest. *Id*.

According to trial testimony, petitioner unequivocally pulled back the arrow, took aim and released the bow without falling or stumbling in any manner. *Id*. at ¶ 17. The police were called at 7:50 p.m. and requested a helicopter to airlift Munoz to the hospital, but before the helicopter arrived, Munoz went into cardiac arrest and was pronounced dead at 8:52 p.m. *Id*. at ¶ 19. The medical examiner determined that twenty-seven (27) year old Munoz died as a result of being struck with the razor blade tipped arrow, which had caused sharp force injury when it penetrated Munoz's chest and came out of his back. *Id*. at ¶ 20.

After shooting Munoz, petitioner retrieved his bow case and walked the approximately ten (10) blocks to Brian Monsegur's ("Monsegur") house at approximately 9:00 p.m. and asked Monsegur to "get him out of here." *Id*. at ¶ 21. Monsegur initially refused and asked petitioner to leave, but as petitioner began to walk away, Monsegur relented and they drove around in Monsegur's vehicle for a while. *Id*. Monsegur testified that petitioner appeared to be frantic, emotional and very upset, and stated that the "arrow had hit him" and that he had hidden the

bow. *Id*. at ¶ 22. Monsegur dropped petitioner off in Westhampton at a store called Country Heros; Monsegur testified that petitioner did not appear intoxicated. *Id.*

At 10:06 p.m., New York State Trooper Stephen Campo pulled over Redlich's pick-up truck and questioned Redlich and Zulferino, who advised that petitioner had just called them from Country Heros. *Id*. at ¶ 23. Trooper Campo arrested petitioner at 10:14 p.m. and transported him to the trooper's barracks; during the car ride, the trooper spent ten (10) minutes with petitioner and concluded that he was not intoxicated, i.e., his face was not flushed, his eyelids were not droopy, his eyes were not bloodshot, there was no odor of alcohol, petitioner's speech was not slurred and he was attentive, responsive and lucid during their conversation. *Id*. at ¶ 24.

After his arrest, petitioner called Redlich and told him where the bow was hidden, which Redlich conveyed to the police. *Id*. at ¶ 25. On January 11, 2006, police found a large, plastic, hard-covered, black bow case hidden behind particle board alongside a residential fence. *Id*. Inside the case was a bow, a quiver, a small flashlight and arrow, however, the compound bow's release was not recovered. *Id*.

At trial, petitioner testified that he had started drinking Southern Comfort with a friend at approximately 11:30 a.m. on the day of the murder and by 5:30 p.m., after consuming approximately twenty (20) ounces of alcohol and taking a Xanax, he was intoxicated. *Id*. at ¶ 30. The argument with Redlich had intensified at about this time when Redlich told petitioner that he and his girlfriend were leaving to buy more drugs. *Id*. at ¶ 28. When Redlich returned, petitioner went inside, rolled a marijuana cigarette and, after putting a release on the bow, practiced target shooting in his backyard. *Id*. at ¶ 31. Despite petitioner's alleged inebriation, he recalled that he

hit the target's bull's eye on each attempt. *Id*.

He also testified that he fired an arrow into Zulferino's truck "for fun," but then notched another arrow to protect himself after recalling that Redlich kept a shotgun in his truck. *Id*. at ¶ 33. In contrast to the prosecution's witness testimony, petitioner stated that after telling the people across the street to mind their business, he turned to Zulferino to tell him that things were "okay," lost his balance and accidentally fired the bow, *id*. at ¶ 26; he attributed the loss in balance to his prosthetic leg, testifying that it had not locked properly. He claimed that he accidently released the bow's trigger and the arrow shot up in the air, killing Munoz on its downward trajectory and that if he had intended to kill Munoz, the arrow would have sliced through him with no downward trajectory and landed behind him. *Id*.

Petitioner claimed that after the shooting, he panicked, went into his house, secured the bow in its case, covered his jacket with a second coat and ran out of the back door. *Id*. at ¶ 35. Carrying the bow case, petitioner cut through several residential yards by jumping fences and, observing police cars nearby, hid the bow between some fences and discarded the coat he was wearing when he killed Munoz. *Id*. at ¶ 36. Petitioner admitted that he took these actions to thwart arrest and had disposed of the bow case to deflect any connection to the shooting. *Id*.

On December 12, 2006, a unanimous jury found petitioner guilty of murder in the second degree and on January 9, 2007, the trial court sentenced petitioner to the maximum term of twenty-five (25) years to life. *Id*. at ¶ 37.

### C. Procedural History

On November 6, 2008, petitioner appealed his conviction to New York's appellate division, alleging that: (1) the evidence was insufficient to support his conviction; (2) the trial

court improperly denied his request for a jury instruction on intoxication; (3) the trial court erred in allowing the prosecutor to introduce evidence of petitioner's prior bad act; and (4) his sentence was harsh and excessive. *Id*. at ¶ 38. The appellate division affirmed the judgment. *People v. Sirico*, 888 N.Y.S.2d 544 (N.Y App. Div. 2009).

On November 9, 2009, petitioner sought leave to appeal from New York's Court of Appeals, which granted petitioner's request on March 19, 2010. Ans. ¶ 39. Petitioner argued that: (1) the trial court improperly denied his request to instruct the jury on intoxication pursuant to New York's Penal Law § 15.25; (2) the trial court erred in permitting the prosecution to introduce evidence of petitioner's call to 911 shortly before the incident; and (3) insufficient evidence supported the conviction and the verdict was against the weight of the evidence. *Id*. at ¶ 39. On June 7, 2011, the Court of Appeals affirmed the appellate division and held that the there was insufficient evidence that petitioner was so intoxicated that he was unable to form the requisite intent and that petitioner's other contentions were meritless. *People v. Sirico*, 952 N.E. 1006, 1007 (N.Y. 2011).

### D. Sirico's Petition for a Writ of Habeas Corpus

Petitioner alleges that a writ should issue on the following grounds: (1) the trial court erred in denying petitioner's request to instruct the jury on intoxication pursuant to New York's Penal Law § 15.25 ("PL"); (2) the trial court erred in admitting evidence of petitioner's unrelated fake 911 call as the testimony was irrelevant, inflammatory and prejudicial; and (3) the prosecution did not prove petitioner's guilt beyond a reasonable doubt because the evidence showed that his conduct was negligent, not intentional, or, the verdict was against the weight of the evidence.

## II. Discussion

### A. Legal Standard for a Writ of Habeas Corpus by a Person in State Custody

"In reviewing a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, a federal district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution, or any laws and treaties of the United States." *McCool v. New York State*, 29 F. Supp. 2d 151, 157 (W.D.N.Y. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)).

As amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), 28 U.S.C. § 2254(a) provides that a "district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A federal court may grant a writ of habeas corpus to a State prisoner where the federal claim was "adjudicated on the merits" in state court if adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[5]

28 U.S.C. § 2254(d).

"An 'adjudication on the merits' is a "substantive, rather than a procedural, resolution of

---

3. "This standard of review, as opposed to the standard existing prior to the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, is more deferential to state court decisions." *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003).

a federal claim.' " *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)(quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). A "state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Id.* (quoting 28 U.S.C. § 2254(d)(1)). "When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Id.*

The Second Circuit Court of Appeals expressly adopted the "Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated 'on the merits' by a state court." *Id.* at 314. In *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999), the court held:

> [W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.

Where a state court has not adjudicated a state prisoner's federal claim on the merits, the " '[the court applies] the pre-AEDPA standards and review[s] *de novo* the state court disposition of the petitioner's federal constitutional claims.' " *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003) (quoting *Cotto v. Herbert*, No. 01 Civ. 2694, 2003 WL 1989700, at *6 (2d Cir. May 1, 2003)).

Title 28 U.S.C. § 2254(e)(1) provides that the "determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence."

    **B.**  **Petitioner's Application for a Writ Pursuant to 28 U.S.C. § 2254**

      1.  **The Intoxication Instruction**

  Petitioner argues that the evidence presented during trial was sufficient to warrant an intoxication charge, including evidence that his mental capacity was diminished by intoxicants of such a nature and quantity that he was unable to form the necessary criminal intent. Pet. p. 28. The trial court denied petitioner's request for the instruction, holding that insufficient evidence existed for a "reasonable person to entertain a reasonable doubt" as to petitioner's ability to form the requisite criminal intent because "there was no evidence that petitioner's mind was affected by the intoxication to such a degree that he was incapable of forming the intent necessary for the commission of the crime." Resp. Mem. (DE 8-1) p. 9. On appeal, the Appellate Division affirmed the trial court based upon the intoxication evidence presented at trial. *Sirico*, 888 N.Y.S.2d at 545. The Court of Appeals affirmed the Appellate Division, holding that petitioner was not entitled to the charge because there was "insufficient evidence to support an inference that defendant was so intoxicated as to be unable to form the requisite criminal intent" and "the uncontradicted record evidence, including defendant's own account, supports the conclusion that his overall behavior on the day of the incident was purposeful." *Sirico*, 952 N.E.2d at 1007.

  With respect to whether an intoxication charge should have been given, the federal court's " 'role here is not to interpret New York's law . . . but to determine whether the evidence was sufficient to warrant a . . . charge under that law.' " *Bryant v. Fisher*, No. 05 Civ. 0437, 2005 WL 3418282, at *14 (S.D.N.Y. Dec. 14, 2005) (quoting *Davis v. Strack*, 270 F.3d 111, 123

n.4 (2d Cir. 2001)).  Thus, a federal habeas court considers: (1) whether the charge was required as a matter of New York law; (2) if so, whether the failure to give the requested charge violated due process; and (3) whether the state court's failure to give the required charge can be remedied by a writ in light of the AEDPA limitations prescribed in 28 U.S.C. § 2254.  *Manning*, 2006 WL 3408575 at *5; *see Bryant*, 2005 WL 3418282, at *14.

### *Whether the Charge Was Required as a Matter of New York Law*

New York Penal Law § 15.25 provides: "Intoxication is not, as such, a defense to a criminal charge; but in any prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negative an element of the crime charged."  Therefore, New York state courts should instruct the jury on intoxication " 'if there is sufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis.' "  *Manning v. Fischer*, No. 06 Civ. 2052, 2006 WL 3408575, at *6 (S.D.N.Y. Nov. 22, 2006) (quoting *People v. Rodriguez*, 564 N.E.2d 658, 659 (N.Y. 1990); *People v. Perry*, 462 N.E 143, 143 (N.Y. 1984)).

Petitioner testified that on the day of the murder, he drank approximately twenty (20) ounces of Southern Comfort between 11:30 a.m. and 5:30 p.m., in addition to taking a Xanax and that he was intoxicated at the time of the shooting.  Redlich testified that he observed petitioner drinking Southern Comfort that afternoon and that he had taken Xanax that afternoon.  Monsequr testified that when petitioner arrived at his home after shooting Munoz in the chest, he appeared frantic and emotional.[6]

---

[6] These facts are taken from petitioner's brief on appeal to the Court of Appeals, upon which he relies for the claims in his habeas petition.  DE 1, pp. 28-29.

However, although he admitted that he was "pretty aggravated" and acted "very stupidly," petitioner never attributed his actions to being intoxicated; rather, he unequivocally attributed the discharge of the arrow to accident, i.e., that his prosthetic leg failed to lock. Resp. Mem. p. 13. Petitioner also recalled how, immediately prior to shooting Munoz, he shot two (2) arrows with each hitting the intended target. *Id.* Petitioner also described how he intentionally shot the side of Zulferino's truck with an arrow and, upon realizing that he made a mistake, notched another arrow to discourage Redlich from shooting him with a shotgun Redlich kept in his truck. *Id.* Petitioner also described how after he heard Munoz say, "he shot me," he went into his house, put on a second coat, deliberately placed his bow in its case and hoisted it, despite its awkwardness,[7] over fences as he traveled through residential areas to Monsequr's house. *Id.* at 14. When petitioner noticed police in the area, he deliberately secreted the bow and threw his coat into a garbage pail so police would not recognize or connect him to the shooting. *Id.*

Based upon the foregoing, there was insufficient evidence of intoxication in the record for a reasonable person to entertain a doubt as to the element of intent on that basis and, therefore, the trial court was not required to give an intoxication charge to the jury. Accordingly, the state court's adjudication of petitioner's claim neither resulted in a decision that was contrary to, or involved an unreasonable application of federal law, nor was the decision based upon an unreasonable determination of the facts in light of the evidence presented. For these reasons, habeas relief on this ground is not warranted.

---

[7] The bow case weighed about twenty (20) pounds and was approximately four (4) feet long.

## 2. Evidence of Petitioner's Prior Bad Acts

Petitioner contends that the trial court improperly allowed evidence of petitioner's sham telephone call to 911, wherein he alleged that a violent fight involving drugs and gunfire had taken place across the street from his house. Pet. p. 31. He argues that the call had no probative value, was unrelated to the death of Munoz, and only served to prejudice the jury. *Id.* at 35.

"As a threshold matter, *Molineux* sets forth a state evidentiary rule, not a rule of clearly established federal law, and 'it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions.' " *Cox v. Bradt*, No. 10 Civ. 9175, 2012 WL 2282508, at *14 (S.D.N.Y. June 15, 2012) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)) ("[F]ederal habeas relief does not lie for errors of state law."). *See Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y. 1995) ("In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue."). "A trial court's decision to admit evidence of uncharged crimes pursuant to *Molineux* 'constitutes an evidentiary ruling based on state law' and is therefore generally not subject to habeas review. *Cox*, 2012 WL 2282508, at *14 (quoting *Sierra v. Burge*, No. 06 Civ. 14432, 2007 WL 4218926, at *5 (S.D.N.Y. Nov. 30, 2007)) ("A decision to admit evidence of a criminal defendant's uncharged crimes or bad acts under *Molineux* constitutes an evidentiary ruling based on state law."). "Moreover, the Supreme Court has expressly declined to decide whether admitting evidence of uncharged crimes violates due process." *Id.* at *15. *See Estelle*, 502 U.S. at 75 n.5 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime.").

Despite these well-settled principles, habeas relief "may be warranted based on a state

court's evidentiary ruling in the rare case where a petitioner can demonstrate that an erroneous evidentiary ruling resulted in a violation of a fundamental constitutional right, like the right to a fair trial or due process." *Cox*, 2012 WL 2282508, at *14.

The trial court, citing *People v. Molineux*, *supra*, held that upon assessment of the probative value of the evidence against the potential for undue prejudice to the defendant, the 911 call provided necessary background information that was "inextricably intertwined with the circumstances of this case." Pet. pp. 34-35. In affirming the trial court, the Appellate Division held that "any error in admitting this evidence was harmless because the evidence of the defendant's guilt was overwhelming and there is no significant probability that, had it not been for the alleged error, the jury would have acquitted the defendant." *Sirico*, 888 N.Y.S.2d at 545. The Court of Appeals held that petitioner's contention was meritless. *Sirico*, 952 N.E.2d at 1007. Accordingly, petitioner has not stated a constitutional violation and this claim is not subject to habeas review.

### 3. The Evidence in Support of the Verdict

Petitioner alleges that the evidence at trial established that his conduct was negligent, not intentional, and thus, the government failed to establish that he was guilty of second degree murder or, alternatively, the verdict was against the weight of the evidence. Pet. pp. 4, 39-47. The jury was given one (1) count of intentional homicide (PL § 125.25(1)), which required it to find that petitioner intended to cause and caused the death of Munoz and the lesser-included offense of criminally negligent homicide (PL § 125.10). *Id.* at 40. Petitioner argues that he could not have formed the culpable mental state for second degree murder based upon his use of alcohol and Xanax on the day of the shooting. *Id.* at 41. The Appellate Division held that the

evidence at trial "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt" and that it was "satisfied that the verdict of guilt was not against the weight of the evidence." *Sirico*, 888 N.Y.S.2d at 545.

"A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus proceeding 'bears a very heavy burden.'" *Vega v. Griener*, No. 97 Civ. 2336, 2002 WL 31409364, at *4 (E.D.N.Y. July 17, 2002) (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 813 (2d Cir. 2000)). "Habeas corpus relief must be denied if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

As discussed above, the trial testimony established that petitioner was not entitled to an intoxication charge because he was not inebriated at the time he shot Munoz and, therefore, the argument that he was incapable of forming the culpable mental state for second degree murder fails. In addition, petitioner's arguments regarding the trajectory of the bow, whether it was at "full draw" and that his prosthetic leg failed to lock were all rejected by the jury, whose findings are attributed great deference given the jurors' opportunity to view the witnesses, hear their testimony and observe their demeanor. *Sirico*, 888 N.Y.S.2d at 545 (citing *People v. Bleakly*, 508 N.E.2d 672, 675 (N.Y. 1987)) ("Great deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor."). Accordingly, petitioner has not met his burden of establishing that the verdict was against the weight of the evidence and as a result, is not entitled to habeas relief.

## III. Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus is **DENIED** and the proceeding is dismissed in its entirety. As petitioner has failed to make a substantial showing of the violation of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(1); *see also Miller –El v. Cockrell*, 537 U.S. 322, 336 (2003); *Contino v. United States*, 535 F.3d 124, 127 (2d Cir. 2008). Petitioner has the right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. *See* 28 U.S.C. § 2253.

The Clerk of the Court shall enter judgment in favor of respondent, close this proceeding and serve notices of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to petitioner at his last known address.

**SO ORDERED**.

Dated: June 15, 2015
      Central Islip, New York

/s/
Sandra J. Feuerstein, U.S.D.J.